LORD, RECEIVER v. BATES, TREASURER.

1. MANDAMUS—PARTIES.—The State is not a necessary party to an application by a private citizen for a writ of mandamus to enforce a private right.
2. STATE BONDS—REFUNDING RESOLUTIONS—LEGISLATURE.—The refunding resolutions since 1876 show an intention on the part of the legislature to exercise the *exclusive* power of determining the conditions upon which the bonds of the State should be reissued or funded, also the mode and manner of such reissuing and funding.
3. IBID.—MANDAMUS—ACTS CONSTRUED.—Under the acts of December 22, 1873, December 20, 1878, and December 24, 1880, to reduce the

volume of the public debt, and to provide for the payment of the same, on *actual* surrender of the bonds themselves, and the cancellation thereof by the state treasurer, are required, and he cannot be compelled by mandamus to refund a *lost* bond, not *actually* surrendered; and the decree of the Court that the receiver is entitled to the bonds, and to have them refunded, does not alter the rule.

This action, in the original jurisdiction of the Court, is based upon a petition by Samuel Lord, as receiver of the late corporation known as the president, directors and company of the State Bank, praying for a writ of mandamus against Hon. W. T. C. Bates, state treasurer, requiring him to fund certain State bonds, alleged to be the property of said corporation, which have been lost. The case was first heard by the Supreme Court of four Justices, on the 18th day of May, 1896, and by them on the same day ordered to be argued before the full Court. Accordingly it was argued on the 30th day of May, 1896, before the full Court, consisting of the four Justices of the Supreme Court and the following Circuit Judges: Hon. Jas. Aldrich, Hon. Ernest Gary, Hon. D. A. Townsend, Hon. R. C. Watts, Hon. W. C. Benet, Hon. O. W. Buchanan, and Hon. Jos. H. Earle.

*Messrs. McCradys & Bacot*, for petitioner.

*Mr. Attorney General Barber*, contra.

Jan. 4, 1897. The opinion of the Court was delivered by MR. JUSTICE GARY. The State Bank was incorporated as a banking institution prior to the late war. In order to prevent confusion, it may be well to state at the outset, that the State Bank was a private banking corporation, and the Bank of the State was a public corporation established for the benefit of the State. Upon the seige of the city of Charleston, in 1863, the assets of the State Bank were removed to the town of Camden, where, in 1865, they were taken from the agent of the bank, by soldiers in the invading army of General Sherman, then passing through the

State.   In 1869 an act was passed, entitled "An act to enable
the banks of the State to renew business or to place them
in liquidation."   Prior to the passage of said act, George
Garvin, a creditor of the State Bank, filed a creditor's bill
against the president, directors, and company of the State
Bank, alleging the insolvency of the bank.   In pursuance
of the provisions of said act, the attorney general intervened
in that cause, and upon his motion an order was made ap-
pointing James B. Betts receiver of all the assets of the
bank.   Among the assets of the bank which were taken
from the agent at Camden, as aforesaid, were one hundred
bonds of the State of South Carolina, issued in aid of the
Blue Ridge Railroad, under an act of the legislature passed
in 1854, numbered from 801 to 900, and each of the de-
nomination of $1,000.   Nineteen of said bonds had been
recovered by the bank before the appointment of said re-
ceiver.   At the next term of the Court an order was entered,
reciting that it was made in pursuance of the act of 1869,
aforesaid, whereby the receiver was required by advertise-
ments in the cities of Charleston, Columbia, and New York,
to call upon all persons having claims against the bank to
present them to him, "on or before 12 M. of Saturday, De-
cember 31st, 1870, or be debarred from the benefits of the
final settlement of the accounts of the said bank."   This
order also enjoined the treasurer from paying either the
principal or interest upon any of the eighty-one bonds re-
maining outstanding to any person except to the said re-
ceiver.   The receiver was ordered in his advertisements to
call upon all persons holding any of these bonds to present
the evidence of their right to them, and he was required
to report the claim and the evidence of them, at the Feb-
ruary term, 1871.   A copy of this order was served on the
treasurer.   Mr. Betts, the receiver, having died, on motion
of the attorney general, Benjamin C. Pressley was appointed
in his place, February 4, 1876, and Mr. Pressley having
been elevated to the bench, on motion of the attorney gen-
eral, Mr. Samuel Lord was appointed in his place by order

7—48

of the Court, May 4, 1878. Upon entering on his duties as receiver, Mr. Lord discovered that while the order of the 20th of April, 1870, had enjoined the payment of the bonds mentioned, it had not enjoined the funding of them under the conversion act of 1869, or under the consolidation act of 1873, and that in the meanwhile several of these bonds had been funded and were thus lost to the receiver. Another order was thereupon made by the Court on the 30th of July, 1878, enjoining the state treasurer from *funding or consolidating* any of the remaining outstanding bonds. None of these bonds have been since knowingly funded or paid by the treasurer. Orders for releasing the injunction, and for the funding of specific bonds as they were recovered from time to time, had been made in each instance, until the 23d of November, 1883, when the injunction was modified so as to allow the receiver to fund the bonds recovered by him without further special orders. Sundry more of these bonds having been recovered from time to time, were under the last order funded by the receiver, and the proceeds distributed under orders of the Court. The charter of the State Bank expired in 1874, and was not renewed.

Edward Sebring, president of the bank, died in 1880, leaving Charles Kerrison as sole surviving director and trustee. The original plaintiff, George Garvin, abandoned the conduct of the action. On the — day of June, 1894, a supplemental complaint was filed by Robert Mure and W. I. Middleton, surviving copartners of Robert Mure & Co., and Edward McCrady and Alfred Chisholm, executors of William C. Bee, deceased, against Charles Kerrison, sole surviving director and trustee of the State Bank, and W. T. C. Bates, state treasurer. Both defendants answer the supplemental complaint. On the 29th of June, 1894, his Honor, Judge Witherspoon, made an order by which the case was referred to Wm. Gibbes Whaley, one of the masters for Charleston County, to inquire and report which, if any, of the bonds in question had been funded, and which, if any, were still outstanding, unpaid and unfunded, with

leave to report any special matter.  The master reported that thirty-eight bonds, which he enumerated by their specific serial numbers," are still outstanding and unpaid," and "that the said bonds are the property of the late corporation known as the president, directors and company of the State Bank, and that the receiver of the said corporation is the only person entitled to fund and collect the same from the treasurer of the state."  Upon the hearing of the cause on the 21st August, 1894, the Hon. O. W. Buchanan, attorney general, appearing for the state treasurer, his Honor, Judge Witherspoon, entered an order confirming the report, as follows: "I further find that the said bonds so claimed in the supplemental complaint, and found in the supplemental report to be outstanding and unfunded, to wit: (then follows an enumeration of the bonds) are the property of the president, directors and company of the State Bank, and that the receiver of the said corporation is the only person entitled to fund and collect the same from the treasurer of the State."  From this order there was no appeal.

On the 13th of October, 1894, his Honor, Judge Ernest Gary, made an order, a part of which is as follows: "It is further ordered, that the said Samuel Lord, receiver, be and is hereby authorized and instructed to memorialize the General Assembly, at its next session, to issue to the said Samuel Lord, receiver of the president, directors, and company of the State Bank, the bonds of the State, which, by order of the Court, have been declared to be the property of the State Bank, and to be allowed to refund the same under the acts of the State in such case made and provided."

The following facts are stated in the return of W. T. C. Bates, state treasurer: That at the regular session of the General Asseembly of the State of South Carolina, in November, A. D. 1894, the relator, as receiver of the president, directors, and company of the State Bank, in obedience to the order of Judge Gary in the cause set forth in the petition, presented to the General Assembly a memorial praying for the passage of a joint resolution authorizing

the treasurer of the State to issue to him, in settlement and discharge of the said thirty-eight (38) bonds and of the interest accrued thereon, bonds or stocks in accordance with the terms of "An act to reduce the volume of the public debt, and to provide for the payment of the same," approved 22d December, A. D. 1873, and the acts amendatory thereof, and he be authorized to refund the same, under the provisions of an act, entitled "An act to provide for the redemption of that part of the State debt known as brown consols by the issue of other bonds or stocks," approved 22d December, A. D. 1892.

That at the said session of the General Assembly the following joint resolution was introduced in the Senate and in the House, to wit: "A joint resolution (Senate) authorizing the state treasurer to issue to Samuel Lord, as receiver of the president and directors of the State Bank, or his duly appointed successor, consolidation bonds or stock equal in amount to fifty per centum of the par value of certain six per cent. State bonds, and interest thereon (which bonds were taken and lost or destroyed by Federal soldiers during the late civil war, and to which the said receiver, by decrees of the Courts, has been adjudged entitled), and to permit the refunding of the same under the acts for the redemption of the State debt."

That the said joint resolution passed the Senate and was sent to the House, and, after consideration in that body, was continued until the next session; that the following resolution was introduced in the House at the session of 1894, after the continuance of the joint resolution aforesaid: "Whereas, a Senate joint resolution (introduced in the General Assembly of 1894, upon a memorial of Samuel Lord, as receiver of the State Bank, presented by the authority and direction of the Hon. Ernest Gary, Circuit Judge, and praying the passage of a joint resolution to authorize the state treasurer to consolidate and refund to said receiver certain lost bonds of the State, decreed by the courts of the State to belong to the said State Bank), has been continued

to the next session of this House, so as to allow further investigation of the matters and things stated in said memorial and resolution; therefore, Be it resolved, that it be referred to a special committee of this House, consisting of three members to be appointed by the speaker, to investigate the matters and things stated in the said memorial and joint resolution, with power and authority for such purposes to examine the state treasurer's office and the vouchers and other records thereof, and that the said committee do report to this House at its next session." That at the session of the General Assembly for 1896, a majority and minority report of the committee appointed under the aforesaid resolution was submitted to the House, and the joint resolution aforesaid was defeated by a large vote. This proceeding for a writ of mandamus was instituted without requesting or obtaining from the attorney general his consent to the use of the name of the State. The rule to show cause herein was signed by his Honor, the Chief Justice, on the 27th day of March, 1896. The petition and rule were served on the respondent, W. T. C. Bates, state treasurer, on the 1st day of April, 1896, and filed in the clerk's office on the same day. On the 15th day of April, his Honor, Judge Benet, made the following order, to wit: "Samuel Lord, the receiver in this case, having recently presented to the Chief Justice of the Supreme Court of the State of South Carolina an application or petition for a writ of mandamus to require the treasurer of the State to fund the bonds mentioned in the decree of his Honor, I. D. Witherspoon, herein, of the 21st August, 1894, finding the same to be the property of the State Bank, and that he, the said receiver, is the only person entitled to fund and collect the same from the treasurer of the State, and the Chief Justice having thereupon ordered that the state treasurer do show cause to the said Supreme Court on Tuesday, the 21st day of April, 1896, why a writ of mandamus should not issue, as prayed in the said application or petition. Now, on motion of McCrady and Bacot, plaintiff's attorneys, it is

ordered, that the above recited action of the said receiver be confirmed, and that the said receiver be, and is hereby, authorized and empowered to prosecute the said proceedings for mandamus." This order was filed in the office of the clerk of the Supreme Court on the 17th day of April, 1896, and a copy thereof was forwarded to the attorney general, representing the respondent. The return of the respondent was filed on the day fixed in the rule to show cause. On the 28th day of April, 1896, the following suggestion and motion on behalf of the State of South Carolina was filed in the clerk's office, and a copy thereof served on the attorneys for the relator. "Now comes the attorney general of the State of South Carolina, and on information and belief suggests to this honorable Court and gives it to understand and be informed (appearing in that behalf only for the purposes of this motion, and without submitting the State to the jurisdiction of the Court), that the right to use the name of the State in this proceeding has never been asked for by nor given to the relator herein; that he has no right to the use of the same, and that the State now refuses and objects to such use." Wherefore he moves that the said petition be dismissed, and for such other order as may be proper in the premises.

The petitioner's attorneys in their argument present three subjects for the consideration of this Court, as follows: I. As to the character of the proceeding by mandamus and its effect. II. As to the nature and effect of the decree of the 21st of August, 1894, upon which the proceeding is based. III. As to the character of the funding act under which the petitioner asks that the treasurer shall be required to fund the bonds in question. They will now be considered in their regular order.

As to the character of the proceeding by mandamus and its effect, the following order in this proceeding has heretofore been filed, to wit: "The petition of the relator for the writ of mandamus having been filed in this case, the attorney general appearing for the purpose of this motion

only, came in with the suggestion and motion on behalf of the State to dismiss the petition, upon the ground that his consent as attorney general to the use of the name of the State in this proceeding had not been obtained, and that he objected to the use of the same. The Court after hearing argument on this motion retired for consultation, and upon reassembling, the Chief Justice announced as the unanimous conclusion of the Court, that the State was not a necessary party to an application by a private citizen for a writ of mandamus to enforce a private right, and that the name of the State in this proceeding was a mere surplusage. It was, therefore, ordered, that the motion to dismiss the petition upon the above stated ground be refused, with leave, however, to the attorney general, if he should so desire, to move to strike the name of the State of South Carolina from the title of the petition in this case. In accordance with leave thus granted the attorney general now moves to strike the name of the State of South Carolina from the title of this case, which motion is hereby granted, and the case will proceed for a hearing on the merits as though commenced originally in the name of Samuel Lord, as receiver, as aforesaid. The reasons for the conclusions reached by the Court will be set forth in the opinion hereafter to be filed upon the merits of the case." Mr. Chief Justice Taney, in delivering the opinion of the Court in the case of *Commonwealth of Kentucky* v. *Dennison, Governor, &c.* (24 Howard's Rep., 66, at page 97), says: "It is equally well settled that a mandamus in modern practice is nothing more than an action at law between the parties, and is not now regarded as a prerogative writ. But the right to the writ, and the power to issue it, has ceased to depend upon any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable. It was so held by this Court in the cases of *Kendall* v. *United States*, 12 Pet., 615; *Kendall* v. *Stokes et al.*, 3 How., 100. And further, that the writ of mandamus does not issue from or by any prerogative power, and is nothing more than the

ordinary process of the court of justice, to which every one is entitled, where it is the appropriate process for asserting the right he claims." Mr. Chief Justice Simpson, speaking for the Court, in *State* v. *Whiteside*, 30 S. C., 581, says: "This writ was once a prerogative writ, and in England was supposed to issue at the instance of the crown to meet and remedy otherwise remediless cases at his discretion. But in this country it has lost its prerogative character, and though issued in the name of the State, yet it belongs to the Courts, and has become a form of action governed by established rules as applied under established form." See, also, A. & E. Enc. of Law, vol. 14, page 92, and authorities referred to in the notes. This question was presented to the Court in *State ex rel Hoover* v. *Chester*, 39 S. C., 307, and while it was in terms reserved, still if the Court had thought the objection interposed by the attorney general was valid, it would have been without jurisdiction in the premises, and, of course, could not have decided the case then before it. The Albany Law Journal of November 7th, 1896, contains a very interesting article, giving a historical sketch of this writ. Many other authorities could be cited in support of our views, but we deem it unnecessary.

We proceed next to a consideration of the second subject, to wit: As to the nature and effect of the decree of the 21st of August, 1894, upon which the proceeding is based. The joint resolutions which have been passed by the General Assembly since 1876, authorizing the state treasurer to reissue bonds of the State in lieu of bonds lost or destroyed, and the legislation hereinafter mentioned upon the subject of funding the bonds of the State, show an intention on the part of the legislature to exercise the exclusive power of determining the conditions upon which the bonds of the State should be reissued or funded, also the mode and manner of such reissuing and funding. The general form in which joint resolutions authorizing the state treasurer to reissue bonds of the State, in lieu of lost

bonds, will be seen from the following: "A joint resolution to authorize the state treasurer to reissue bonds in lieu of bonds lost or destroyed," approved 22d of March, 1878. Be it resolved by the * * * that the state treasurer be, and he is hereby, authorized to reissue to the persons hereinafter named bonds in lieu of certain bonds hereinafter mentioned, that have been destroyed, the said bonds to be duplicates of those that have been destroyed, to wit: "(3) to A. M. Forster, eight bonds for $1,000 each, dated 1st January, 1855, and numbered respectively 1, 2, 3, 5, 7, 8, 11, and payable 1st January, 1875, said bonds having been issued in aid of the Blue Ridge Railroad: *Provided*, That the said parties above named be required, before receiving said new bonds, to give a bond with sufficient surety, to be approved by the state treasurer and legally executed in a sum double the amount of the bonds lost or destroyed, to indemnify the State." His Honor, Judge Gary, seems to have been of this opinion when he granted the order hereinbefore mentioned, giving permission to Mr. Lord, receiver, to memorialize the legislature. The question was not made before his Honor, Judge Witherspoon, in so far as the records show, whether the Court had the power to make a decree, the effect of which would be to supersede the remedy prescribed by statute for funding the bonds of the State. It is our opinion that his Honor, Judge Witherspoon, did not intend by his decree in any manner to interfere with the statutory remedy for funding the bonds in question. We are satisfied it would be unjust to him to hold otherwise. His decree, when read in connection with the pleadings and the order of reference, shows that the ownership of the bonds was the matter in issue, and which it was his intention to adjudicate by his decree.

This being our opinion, we will proceed to consider the third subject mentioned in the argument of the petitioner's attorneys, to ascertain whether the case before us comes either within the letter or the spirit of the legislation enabling persons to fund certain bonds of the State upon the

conditions mentioned in the acts upon this subject. The act approved 22d of December, 1873, to reduce the volume of the public debt, and to provide for the payment of the same, provides: Section 1. "That the state treasurer is hereby authorized and required to receive, from the holders willing to surrender the same," certain stocks and bonds therein mentioned, among which are the Blue Ridge bonds of the State issued in 1854, "and shall, thereupon, in exchange for and in lieu of said bonds and stocks so surrendered, issue to said holders other coupon bonds or certificates of stock as they may desire, equal in amount to fifty per centum of the face value of the bonds or certificates of stock so surrendered." Section 2. "That the state treasurer is hereby authorized and required to receive from the holders willing to surrender the same all the coupons upon the bonds before mentioned which have accrued, or will áccrue, on the 1st of January, 1874; and shall, thereupon, in exchange for and in lieu of such coupons or interest orders so surrendered, issue to said holders coupon bonds or certificates of stock, as they may desire, equal in amount to fifty per centum of the face value of the coupons or interest orders so surrendered." Section 4. "And the bonds and certificates of stock so taken up shall be cancelled by the treasurer, and a list of their dates, numbers, and amounts, and by whom signed, recorded in the office of the secretary of state." Section 10. "That the bonds, coupons, and stock so redeemed shall be immediately cancelled by the holders thereof, at the time of redemption, and filed in the office of the treasurer, and be entered as credits upon and to that extent in the extinguishment of the public debt. That a detailed statement of the number, denomination, and series of the bonds and stocks so redeemed and cancelled, together with the price paid for each bond and stock as aforesaid, shall be prepared by the treasurer, signed by the board, and furnished to the General Assembly at each annual session thereof." Section 11. "That all bonds and stocks of the State received in ex-

change for the bonds or stocks herein authorized shall be cancelled immediately by the holders thereof, on presenting the same for exchange, and filed by the treasurer with the permanent records of his office; and a correct registry shall be kept of all exchanges made under this act, so as to exhibit, in a separate account and convenient form, the numbers and amounts of all bonds and stocks received into the treasurer's office, together with the numbers and denominations of all bonds and stocks issued in exchange therefor. And the secretary of state is hereby required to keep at all times a correct registry of all the bonds sealed by him under the provisions of this act; and the governor is, in like manner, hereby required to keep a similar registry of all bonds signed by him, each registry to be accessible for public inspection at all times." Section 14. "That if any officer of the State, upon whom any duty is involved under the provisions of this act, shall neglect or refuse to perform said duty, he shall be subject to indictment for felony, and, upon conviction thereof, shall be fined in a sum not less than $10,000 nor more than $20,000, and imprisonment in the penitentiary not less than three nor more than five years, at the discretion of the Court."

Act of December 20th, 1878, "To extend the time for funding the unquestionable debt of this State," provides: Section 1. "That the state treasurer is hereby authorized and required to receive from the holders willing to surrender the same, all outstanding bonds and certificates of stock of the State, issued prior to the 1st day of January, 1866, and coupons on said bonds and interest orders upon the certificates of stock which have matured or may mature on the 1st July, 1879, and shall thereupon issue to said holder other coupon bonds and certificates of stock at the rate of fifty per centum of the face value thereof, in all respects, as is provided for in the act of assembly, approved 22d December, 1873, entitled 'An act to reduce the volume of the public debt and provide payment of the same,' with respect to bonds and certificates of stock, and such coupons of bonds

or interest orders on stock which accrued on the 1st of January, 1874, and prior thereto." Act of 24th of December, 1879, simply extended the time for funding the unquestionable debt of the State until 31st of October, 1880.

Act of 24th December, 1880, "To extend the time for funding the unquestionable debt of the State," provides: Section 1. "That the state treasurer is hereby authorized and required to receive from the holders thereof who may be willing to surrender the same, all outstanding bonds and certificates of stock of the State, issued prior to the 1st day of January, 1866, together with the coupons of said bonds and interest orders upon said certificates of stock which have already matured, or which may mature on or before the 1st day of January, 1880, and in lieu thereof shall thereupon issue to said holders other coupon bonds or certificates of stock at the rate of fifty per centum of the face value of the material so surrendered, in all respects as is provided for in the act of the General Assembly, approved 22d December, 1873, entitled 'An act to reduce the volume of the public debt, and provide for the payment of the same,' with regard to the bonds and certificates of stock whose issue is provided for in said act." Section 2. "That the holders of such bonds and stocks and interest as may be reported not affected by said decision, and the holders of valid portion or portions of such bonds and stocks and interest as may be reported in some degree to be affected by the said decision, shall be entitled to surrender the same, together with all coupons and interest orders belonging thereto which have already matured or which may mature on or before the 1st day of January, 1880, to the state treasurer, for cancellation, who shall thereupon cancel the same. That the state treasurer is hereby authorized and required, in lieu of the bonds, stock and interest so surrendered, to issue for so much thereof as are declared in said report to be valid in whole and for the valid portion of so much thereof as in said report are declared valid only in part, other coupon bonds and certificates of stock, at the rate of fifty per

cent. of the face value of the valid material so surrendered as aforesaid: provided, that nothing in this section contained shall authorize the funding of any coupons which matured prior to the 1st day of July, 1872, and which have been detached from the bonds to which they belong."

At the last session of the legislature (25th February, 1896), an act was passed, providing that after its passage no coupon bond of the State payable to bearer, nor any coupon thereof, should be consolidated, converted, funded or paid by the state treasurer after expiration of twenty years from the date of maturity of such bond. (Vol. 22 of Stat., page 183.) It only needs a glance at the acts aforesaid to see that the inability to produce the bonds themselves will prevent a compliance with the requirements of the acts according to the *letter* thereof. Does this case, then, fall within the spirit of the said legislation? Section 14 of the act of 1873, hereinbefore set out, shows that the legislative intention was to insist upon a *strict* compliance with the requirements of said act. The object was to prevent fraud, as to which it was not entirely successful, even with its strong safeguards, which cannot be enforced when the bonds cannot be surrendered for cancellation. The requirements of the act cannot be complied with except by an *actual* surrender of the bonds themselves and the cancellation thereof by the state treasurer. The duty imposed upon the state treasurer is not plainly defined peremptory and ministerial, and, therefore, *mandamus* is not the proper remedy. The office of the writ of mandamus is thus well expressed by Mr. Justice White, in the case of *International Cont. Co.* v. *Lamont*, 155 U. S., 303: "It is elementary law that mandamus will only lie to enforce a ministerial duty, as contradistinguished from a duty which is only discretionary. * * * Moreover, the obligation must be both peremptory and plainly defined. The law must not only authorize the act (*Commonwealth* v. *Boutwell*, 13 Wall, 526), but it must *require* the act to be done. A mandamus will not lie against the secretary of the treasury unless the laws require him to ·

do what he is asked in the petition to be made to do. *Reeside* v. *Walker*, 11 How., 272; see also *Secretary* v. *McGarrahan*, 9 Wall., 298; and the duty must be clear and indisputable. *Knox County Commissioners* v. *Aspinwall*, 24 How., 376."

The writer of this opinion regrets that the limited time within which opinions are required by law to be filed necessitates so brief and concise a statement of the reasons leading to the conclusion at which we have arrived.

It is the judgment of this Court, that the petition should be dismissed.


MR. CHIEF JUSTICE McIVER.   Contrary to my first impressions of this case, I am unable, after very careful and unusually protracted investigation, to reach the conclusion that the relator is entitled to the remedy which he invokes. While fully convinced of the justice of the relator's claim to the bonds, which he is seeking to have funded under the several funding acts referred to in the opinion of Mr. Justice Gary, I am unable to perceive that there is any such plain, ministerial duty imposed upon the treasurer of the State by such funding acts, the performance of which can be enforced by the writ of mandamus.   It is very obvious that neither the treasurer nor any other public officer has any authority, except such as has been conferred upon him, either expressly or by necessary implication, by some act of the legislature; and it is equally obvious that when such authority has been conferred to be exercised in a prescribed manner, it can only be exercised lawfully in the manner prescribed. Hence, when the state treasurer was authorized and required by the act of 1873, and the various other acts amending and extending the same, referred to in the leading opinion, such authority could only be exercised and such duty could only be performed in the manner prescribed in those acts.   Without repeating here the various provisions of those acts prescribing the manner in which the bonds therein referred to must be funded, it is sufficient to say

that it is very plain that those provisions cannot be complied with unless the bonds sought to be funded are delivered up to the state treasurer, cancelled, and filed by the treasurer "with the permanent records of his office." It is very obvious, therefore, that no provision has been made for funding *lost or destroyed* bonds, and the various acts upon the subject will be searched in vain for any intimation, even, that the legislature ever intended to confer any authority, or impose any duty upon the state treasurer, to fund any bonds which have been either lost or destroyed. This may, possibly, have been a *casus omissus* on the part of the legislature; but if so, then, clearly, the courts have no power to supply it, for that would be legislation, not construction of the language used by the law-making department to express its intent; or the legislature may, possibly, have intended to reserve to itself the right to pass upon the claims of those seeking to have lost or destroyed bonds funded, and if so, then, of course, the courts could not interfere.

The fact that the relator has obtained the judgment of a court of competent jurisdiction in a case to which the state treasurer was a party, that the bonds in question are the property of a corporation which the receiver represents, and that he, as such receiver, "is the only person entitled to fund and collect the same from the treasurer of the State," cannot affect the question which the Court is called upon to decide. Such judgment may be of the strongest persuasive force in inducing the legislature to make provision for the funding of these bonds by the relator, as it has done in other cases where the funding of lost or destroyed bonds has been authorized; but until such provision has been made, I do not see how it can be said that there is any such plain, ministerial duty imposed upon the treasurer to fund the bonds here in question, the performance of which can be enforced by mandamus.

I am compelled, therefore, to concur in the conclusion that the petition be dismissed.

HON. JAS. ALDRICH, Circuit Judge.    Upon the conclusion of the argument, and before mature consideration of the issue herein, my impressions were in favor of the relator.    Since then I have studied the history of this case, terminating in the decree of Judge Witherspoon, and the funding acts of this State.    As the result of that study, I have concluded that it is not the plain ministerial duty of the state treasurer, either under said decree or the funding law, or both, to fund the bonds in question.    I do not think that the decree of Judge Witherspoon is as comprehensive or as far-reaching in effect as the relator claims it is.

A careful reading of the various funding acts, extending over a number of years, has caused me to conclude that it is the settled purpose and policy of the legislature to retain the control of all matters pertaining to the funding of bonds. It is not necessary for me to extend this opinion, as I concur in the conclusions reached by Mr. Justice Gary, and the reasons stated in the concurring opinion of the Chief Justice.

I concur, therefore, in the conclusion that the petition be dismissed.

HON. O. W. BUCHANAN, Circuit Judge.    I think the tendency of modern authority does not regard a writ of mandamus as issued at the instance or by the consent of any prerogative power through the attorney general, except in matters directly concerning the State, and even here not on any ground peculiarly applicable to a State alone, but upon the ground that, as he is the agent and attorney for South Carolina, it is his duty to see that an unauthorized person does not make his client and principal a party plaintiff to an action or proceeding that cannot possibly be of any benefit (but may be of great injury) to her.    The tendency is to consider the proceeding by mandamus as a suit.    The State cannot be heard without her counsel, but if unauthorized persons are allowed to use the name of the State as plaintiff, this wise provision of the fundamental law will be neutralized.    Once in Court, matters involving the whole

policy of the State may be put in issue.   The gravest consequences may very properly be feared.   I think that any one injured in his private rights or property may now apply for the writ in his own name.   If a proper showing is made, the writ may issue from the hands of the Court, full power to do which is expressly given by the words of the law. This power, however, does not authorize the use of the name of the State in the application for the writ.   The individual sets out his grievance and petition in his own name and title.   If some interest of the State is to be conserved, the application is entitled in the name of the State, or that of the particular officer whose duty it is to attend to the matters aggrieved or disturbed.   In the latter case, the attorney general or State's counsel, being by law charged with the conduct of the State's litigation, has the right to institute such proceedings, or withdraw them if already pending in the interest of the State, as he may think her interest or policy may dictate, as fully as he may a criminal prosecution, to do which is admitted.   The writ in all cases should run in the name of the State.   The application in this case is on behalf of the citizen, and not on behalf of the State; therefore, the use of the name of the State was unnecessary and surplusage, and the same was, with the permission of the Court, stricken out, and considered as an application of the citizen alone; and the request of the attorney general to be allowed to withdraw the name of the State was allowed.   These are my reasons for my agreement upon the preliminary questions.

Upon the merits of the case, I concur in the opinion of Mr. Associate Justice Gary.

MR. JUSTICE JONES.   The relator in this case is the receiver of the State Bank, appointed at the instance of the State, through the attorney general, and is in duty bound to collect and administer the assets of the bank.   The thirty-eight bonds in question are a part of the assets of the bank. These bonds were stolen from the custodian of the bank's

8—48

property by some of Sherman's soldiers, in 1865. The treasurer of the State has, for more than twenty-four years, been enjoined from paying or funding these bonds to any one except to the receiver. Repeated advertisements have been made by the receiver, calling upon all persons holding any of these bonds to come forward and present them, with the evidence of their right to them. No one, except the receiver, has ever made claim for principal or interest, notwithstanding the bonds matured in 1879. A thorough examination of the state treasurer's office proves that these bonds have never been paid or funded. In August, 1894, the Circuit Court for Charleston County, in a cause to which the state treasurer is a party, decreed that the bonds in question "*are the property of the president, directors, and company of the State Bank, and that the receiver of the said corporation is the only person entitled to fund and collect the same from the treasurer of the State.*" No appeal was taken from this judgment. Afterwards the receiver applied to the state treasurer to fund these lost bonds, presenting this decree as his authority and voucher, and declared his willingness to accept the terms of compromise offered by the State to its creditors. The state treasurer refused to fund except upon the actual surrender of the bonds themselves. And now, pursuant to an order of the Circuit Court which rendered the said decree, the receiver has applied to this Court for mandamus to compel the state treasurer to fund these lost bonds. Mandamus lies to compel a public officer to perform a plain ministerial duty, involving no discretionary power imposed upon him by law, to the performance of which the relator has a right, and to enforce which he has no other adequate and specific legal remedy. It is clear that relator has no other adequate legal remedy. A court of competent jurisdiction has finally adjudged against the state treasurer, as a party to the cause, that the receiver owns the lost bonds specifically described, and is the only person entitled to fund the same. This adjudication of the receiver's right to fund implies the correlative duty to fund

by the officer charged with the funding, who was a party to
the cause.    The duty of funding these particular lost bonds,
after this decree, was merely ministerial, and involved no
exercise of discretion on the part of the state treasurer.    So
far as he was concerned, the decree had determined all
questions of identity, ownership, and right to fund.    In this
very important particular, this case is peculiar, and must
be distinguished from a case wherein a claimant of a right
to fund lost bonds applies in the first instance to the state
treasurer, and submits to him the evidence of his right to
fund.    In such case, clearly the state treasurer could not be
compelled by mandamus to fund, as there is no law im-
posing that duty upon him.    It is true, that there is no gen-
eral statute in this State providing for the funding of lost
bonds.    But a ministerial duty flowing from a decree of a
court of competent jurisdiction is as effectually *imposed by
law*, upon an officer bound by the decree, as if the duty had
been enjoined by statute.    Otherwise, the judicial depart-
ment is not a co-ordinate branch of the government.    The
Court's action, within its jurisdiction, is the State's action,
just as fully as a statute within legislative jurisdiction.
The legal right of the relator, under the judgment of the
Court, can be no less sacred in this Court than it would be if
the legislature had declared, in the language of the judgment,
the receiver's title to the bonds and his right to fund them.
Nor does the fact that the House failed to pass the Senate
joint resolr'˙ n to authorize the state treasurer to fund these
lost bonds alter or affect the legal right of the receiver
under the judgment.    The failure or·refusal of the House
to agree to the affirmative relief proposed by the Senate,
cannot be made a basis for the denial of the receiver's right.
If the receiver has an adequate remedy under these pro-
ceedings, as I think he has, legislative action was unneces-
sary, and, therefore, the failure of the legislature to grant
affirmative relief is irrelevant to the question at issue.

     But it is said that in this case the duty of the state trea-
surer is to be ascertained wholly from the funding acts men-

tioned, and that since these acts speak of the "surrender" of bonds authorized to be funded, the state treasurer has no duty to fund without the actual surrender of the bonds themselves. I think the better view is that the state treasurer's duty as to these particular lost bonds is to be ascertained from the funding act, *and from the final decree of the Court to which he was a party.* Viewed in this light, the actual surrender by the receiver of the debt evidenced by the bonds, the property of the receiver, would be a surrender of the bonds. In the case of *Ex parte Barnwell,* 8 S. C., 264, the Supreme Court of this State had occasion to consider the meaning of the word surrender, as applied to "interest orders, upon interest due upon certificates of stock," under the second section of the funding act of 1873. The Court said: "In point of fact, no such orders were attached to the certificates, and when the legislature, through the act, speaks of the 'surrender' of such certificates, it meant nothing more than that the holder, on receiving his coupon bonds or certificate of stock to the amount of fifty per centum for his interest due, should deliver to the treasurer an order to fund it as required by the act; so that it might be shown that the interest which had accrued on his old certificate had been paid and satisfied by the delivery of the new one, in conformity with the prescribed directions." Here, then, the inability of the creditor to produce and surrender an "interest order" on his certificate of stock did not prevent the funding of the interest due on the stock up to its maturity, although the act in terms required such surrender. A surrender by the creditor of his claim or right to interest in such a way as to show that the interest due on the certificates of stock had been paid by the new certificate, was within the terms of the act. So, in the present case, it seems to me, when the true owner of these lost bonds presents to the funding officer the judgment of a court of competent jurisdiction, to which the funding officer is a party, fully describing and identifying the bonds, and adjudging the claimant's title to them and right to fund

them, and declared his willingness to surrender his claim or debt represented by the bonds, that he is within the terms and meaning of the funding act. If he is not squarely within the letter of the act, the judgment of the Court establishing the ownership of the lost bonds and right to fund them, supercedes a literal compliance with the act.

I think, therefore, that the relator is entitled to the writ of mandamus.

HON. JOSEPH H. EARLE, Circuit Judge. I am unable to concur in the opinion of the majority of the Court. My dissent is based mainly on the ground that his Honor, Judge Witherspoon, in a case in which the respondent was a party, and from which there was no appeal, has, by his decree, adjudged that the thirty-eight bonds in question "are the property of the president, directors, and company of the State Bank, and that the receiver of the said corporation is the only person entitled to fund and collect the same from the treasurer of the State." If the petitioner could produce the bonds, then there could be no question as to his right to have the same funded, under the provisions of the funding act; and, hence, in such case, there could be no question as to his right to the remedy by mandamus to compel the respondent to fund the bonds, as such duty under the act is plain and ministerial, and involves the exercise of no discretion on his part. But the bonds, as it is alleged, were forcibly taken from the cashier of the State Bank, in the year 1865, and nothing has been heard of them from that time until this, though due advertisement has been made under orders of the Court for the production of the same by the holders thereof. So, the only question is, is it necessary to produce the bonds themselves as a condition precedent to requiring the treasurer to fund? Unquestionably, this would be necessary in the absence of a proper adjudication as to the loss and ownership of the bonds. But this matter has been settled by said decree. It was thereby determined, not only that the bonds are the

property of the said corporation, but also that the peti-
tioner "is the only person entitled to fund and collect the
same." The question as to the ownership of the bonds, as
well as the right of the petitioner to fund the same, is *res
adjudicata*. To hold otherwise, would be, in effect, to hold
that this Court, in an application for mandamus, could
undertake to reverse a judgment by which a right has been
established. Judge Witherspoon had jurisdiction of the
case in which his decree was entered; proper parties were
before the Court; the ownership of the bonds and the right
to fund them, were matters submitted for determination;
there was no appeal from the judgment, and it is now too
late to question it.

The bonds are only the evidence of a debt of the State,
which is confessedly outstanding and not disputed, and the
ownership of the debt and the right to fund the same hav-
ing been judicially established, the production of the decree
would be a proper substitute for the production of the bonds.
The right is clear, and there is no remedy save by man-
damus. "And where a man has *jus ad rem*, it would be
absurd, ridiculous, and a shame to the law, if he could have
no remedy, and the only remedy he can have is by man-
damus." *Rex* v. *Montacute*, 1st I. W. Blackstone, 62–64.
As Lord Mansfield said in *Rex* v. *Barker*, 3 Burr., 1265: "A
mandamus is a prerogative writ, to the aid of which the
subject is entitled upon a proper case previously shown to
the satisfaction of the Court. It was introduced to prevent
disorder from a failure of justice. Therefore, it ought to be
used on all occasions where the law has established no spe-
cific remedy, and where, in justice and good government,
there ought to be one. The value of the matter, or the degree
of its importance to the public policy, is not scrupulously
weighed. If there be a right, and no other specific remedy,
this should not be denied." In *Church* v. *Chelsea*, 7 Cush.,
239, the Supreme Court of Mass. says: "The application is
to the discretion of the Court, but this is not arbitrary; it
is a judicial discretion, and when there is a right, and the

law has established no specific remedy, this writ should not
be denied." The writ is granted only to prevent a failure
of justice, and is, no doubt, more freely and frequently
granted at the present time than it was formely.

The objection that the bonds cannot be surrendered is
not tenable. The term *surrender*, as used in the funding
act, does not necessarily mean that the bonds should be de-
livered up, but that the right evidenced by them should be
surrendered. As the Court said, in reference to "interest
orders," in *Ex parte Barnwell*, 8 S. C., 269: "In point of
fact, no such orders were attached to these certificates, and
when the legislature, through the act, speaks of 'the sur-
render' of such certificates, it meant nothing more than that
the holder, on receiving his coupon bonds or certificates 'of
stock' to the amount of fifty per centum, for his interest
due, should deliver to the treasurer an order to fund it, as
required by the act, so that it might be shown that the in-
terest which has accrued on his old certificate has been paid
and satisfied by the delivery of the new ones, in conformity
with the prescribed directions." So, in this case, as it ap-
pears to me, an order by the petitioner upon the treasurer
to fund the bonds, to which he is entitled under a decree
of the Court, would be such a surrender of the right evi-
denced by the bonds as is contemplated, at least, by the
spirit of the act. To hold him to a strict and literal com-
pliance of the act, by requiring him to do an impossible
thing, to produce the bonds, would be using a technical
rule to destroy a remedy, after the right has been estab-
lished. *Qui haeret in Litera haeret in Cortice.*

I deem it unnecessary to prolong this opinion, as I fully
concur in the dissenting opinion of his Honor, Associate
Justice Jones.