# CHARLESTON

## FOUSE *et al* v. SHELLY *et al.*

Submitted February 4, 1908.    Decided December 2, 1908.

1. PARTNERSHIP—*Good Faith Toward Each Other.*

It is well settled that partners in all their transactions must observe the utmost good faith towards each other, and this applies as well to their negotiations in the formation of the partnership

agreement as to any subsequent transaction involving their partnership interests.   (p. 434.)

2.  SAME—*Rescission of Contract—Fraud.*
    Equity has jurisdiction to rescind a partnership contract at the instance of a party who has been induced to enter into it by fraudulent representations.  (p. 435.)

3.  SAME—*Accounting—Partnership Lands.*
    S., F., B., and C. entered into an agreement of partnership for the purpose òf purchasing certain lands upon which S. had options, and making improvements for a plant for mining and shipping sand, whereby F., B. and C. were to furnish the capital to be invested and expended by S. for said purposes, S. binding himself to assign and set over to said F., B. and C. three-fourths interest of all his right, title and interest in and to said properties, and further to pledge the absolute title to said properties to said F., B. and C. until all the purchase money, together with the total sum of other expenditures, should be repaid out of the profits of the business or otherwise, "after which monthly settlements are to be made and dividends declared if any there be to each and every member of this agreement as his interest may appear." S. purchased several of the properties and took absolute deeds in fee therefor in his own name, expending therefor over $12,000 furnished by F. and B. for that purpose, C. furnishing none of the funds. S. refused to pledge the title to the properties so purchased or otherwise to secure F. and B. for the moneys so furnished by them to pay for the properties purchased.  *Held:*   That upon a dissolution of the partnership, F. and B. were entitled to have a decree of sale of the lands so purchased for the partnership and held in the name of S. to repay them the moneys so furnished by them.  (p. 437.)

Appeal from Circuit Court, Morgan County.

Bill by John G. Fouse and another against S. F. Shelly and others.  Decree for complainant, and Shelly appeals.

*Affirmed.*

FORREST W. BROWN and J. HAMMOND SILER, for appellant.

X. POOLE, A. C. McINTIRE, and FAULKNER, WALKER & WOODS, for appellees.

McWHORTER, JUDGE:

S. F. Shelly of the first part, J. G. Fouse, I. K. Bechtel and N. L. Chappelle of the second part, on the 2nd day of July, 1901, entered into a written contract of partnership to

the following effect:    "That whereas the said S. F. Shelly, party of the first part is engaged in the general exploring business for all kind of mineral and promoting industries in and throughout the county of Morgan, W. Va., and desires to associate the said Fouse, Bechtell and Chappelle, parties of the second part, with himself to provide and furnish the necessary capital to purchase in fee certain properties hereinafter described for the purpose of developing the properties to the best possible advantage, and for the mutual benefit of all parties to this indenture." (Then followed a list of the properties to be purchased with sums to be paid therefor.) "THEREFORE: It is hereby mutually agreed and covenanted by and between all parties to this indenture upon the conditions and considerations herein contained the said parties of the second part provide and furnish the necessary capital and purchase money to pay for the said properties herein mentioned as provided by and between the several owners respectively, and for the construction of the necessary improvements of the mine and ship the product to market together with all the necessary and legitimate expenses to conduct the operations as required, the said Shelly, party of the first part, for himself, executors, administrators and assigns, will and hereby agrees to assign and set over to the parties of the second part, their executors and assigns three fourths interest of all his right and title and interest in and to the herein described properties; and further agrees that the absolute title to the said property shall *shall* be pledged to the said second parties until all of the purchase money, together with the total sum of other expenditures has been repaid out of the profits of the business or otherwise; after which time monthly settlements are to be made and dividends declared if any there be, to each and every member to this agreement as his interests may appear." And it was further agreed that Shelly should have full charge of the construction of the operating plant and necessary improvements, and be in charge of operating said plant and to receive $100 per month as salary, but to be paid only $50 per month while the plant was being constructed.

At June Rules, 1902, of the circuit court of Morgan county, John G. Fouse and I. K. Bechtel filed their bill, and at July rules filed their amended and supplemental bill of

complaint against S. F. Shelly and wife, N. L. Chappelle and others, for the purpose of dissolving the partnership, enjoining said Shelly from further acting under said agreement or from disposing of any of the property, and asking that the case be referred to a commissioner to ascertain and report a settlement, and that the property be sold and plaintiffs be repaid the amount put into the business. Plaintiffs based their claims on the ground of fraud and misrepresentation on the part of Shelly and Chappelle; that Shelly represented that he paid $3,100 for the "Hunter" property when in fact he only paid $810 for the same including $310 paid to Hunter as commission; that only $1,800 was paid for the "Biser" tract, represented by Shelly to have cost $4,000; that Chappelle had never furnished any money at all for the business, saying he was not in a position to pay; that they had advanced $2,550 cash payment on the "Tannery" property including $50 insurance, paid $3,100 the full amount for the Hunter tract of 31 acres, paid $4,000 in different payments of the Biser tract, $1,007.96 for a railroad siding, and other sums, aggregating the sum of $12,099.96; that though often requested to do so Shelly had failed and refused to secure plaintiffs for the large sum expended either by pledging absolute title to said real estate as security or by conveying the same to a trustee for that purpose.

The defendants Shelly and Chappelle demurred to the bill and amended bill which demurrers were overruled and the defendants answered, denying all allegations of fraud and misrepresentation on their part. Shelly averred that he had lived up to the covenants of the agreement so far as he was concerned, but had been prevented from the performance thereof by the failure of plaintiffs to carry out their part of the agreement; admitted that he had not set over to plaintiffs the three-fourths interest in the real estate, but that he was willing and ready to do so on their complying with their part of the agreement in furnishing the capital to purchase in fee the properties in the agreement mentioned; and praying that the injunction, granted in this case, be dissolved. Chappelle admitted that he had paid no money, but averred that it was understood and agreed between himself and the two plaintiffs that he had performed everything on his part

that was to be performed, and that the business had failed of completion solely by reason of the failure of the plaintiffs to carry out their part of the said agreement and asked to be dismissed with costs.

On the day agreed upon for argument of the cause, counsel for plaintiffs stated that through inadvertence they had failed to allege in their bills that at the time of the execution of the contract of July 2, 1901, and before said contract was signed, plaintiffs asked Shelly what his financial condition was, whether there were any judgments against him and if he owned any real estate, to which Shelly replied that his record was clear, that there were no judgments against him and that he owned certain real estate situated in the town of Berkeley Springs in the county of Morgan, upon which was situated a house in which they then were, being known as the Willard Corner property and that he owned a half interest in the Fairfax Inn in said town of Berkeley Springs, and that in fact all of said representations were false, that there were judgments to the amount of several thousand dollars subsisting and unpaid against Shelly in Luzerne county, Pennsylvania, and that he did not own the real estate claimed in Morgan county; and by agreement of counsel the proposal to amend the bill was waived and the allegation considered properly made in the bill, denied in the answer and answer replied to generally.

On July 19, 1904, the cause came on to be heard upon the bill and amended bill, the agreement of counsel, the answers and general replication thereto, the depositions and arguments of counsel, when the court decreed a dissolution of the partnership, that the deferred payment of $7,-500 due the Tanning Company constituted the first lien on the property sold by said Tanning Company to Shelly; and that the plaintiffs Fouse and Bechtel were entitled to a lien upon all the property in the bill and proceedings mentioned under said agreement of July 2, 1901, for the repayment to them of the sum of $12,099.96 with interest on each part from the time the same was paid. Further decreed that Shelly was not entitled to anything by way of salary but had been overpaid; and appointed special commissioners to wind up the partnership business and to sell the property. Pursuant to said decree the commissioners made sale

of the properties and by decree of October 7, 1904, the action of the commissioners in selling the properties was confirmed.

From this decree of July 19, 1901, S. F, Shelly appealed and assigns as error the dissolution of the partnership, which was equivalent to annulling the agreement of July 2, 1901; the decreeing that plaintiffs were entitled to a lien for the entire amount paid by them; in refusing to allow appellant the salary stipulated in contract after March 1, 1902; in winding up the affairs of the partnership and decreeing a sale of the property, and in falling to take an account between the parties as asked for in defendant's answer.

The facts as disclosed by the evidence are about as follows: About the 22nd or 23rd of June, 1901, Fouse received a letter from Chappelle in which he said he had had several confidential interviews with Shelly and had discovered something of importance and requested him to return to Berkeley Springs at once. On the 29th of June, 1901, Fouse returned to the Springs and was taken by Chappelle to Shelly's office and by him introduced to Shelly, and there they had a conversation which led up to the contract of July 2, 1901. It was proposed that Fouse and Chappelle were to furnish the money for the purposes afterwards set out in the contract of July 2nd. It developed that Chappelle had no ready money and would be unable to assist in raising what was needed for some time. As Fouse did not feel able himself to raise the money for immediate purposes he suggested that his son-in-law, Bechtel, should be made a party to their contract. Shelly informed the parties that he had an option on the Tannery property which would expire at noon on the 1st day of July, 1901; that he had made a bargain to purchase the tract known as the Hunter tract of 31 acres for $3,100; that the property known as the Bingham or Biser property was very desirable and that he would like to purchase it, and that he had a lease on the Wise land and several other properties and that to acquire and develop these properties money was needed. That as the option on the Tannery property was about to expire, it was necessary to raise the cash payment of $2,500 before noon on the 1st day of July, 1901, in order to purchase under the option, and the further

sum of $50 for insurance; and also that it would be necessary to raise $3,100 to pay for the Hunter tract. Fouse said he had no money on hand but had real estate of the value of $30,-000 to $40,000, that he would ask his son-in-law Bechtel to go in with him and if they could raise it, he would send Shelly a message so that he could have it before the option expired. Fouse went to Pittsburg and he and Bechtel raised the $2,-550, and he returned with Bechtel to Berkeley Springs on the 2nd day of July, 1901, to which time Shelly had had the option extended. When the four were together, Shelly explained to Bechtel his plans as he had before to Fouse, and as the agreement required the parties of the second part to advance large sums of money to Shelly to pay for the properties and to put the plant in operation Fouse questioned Shelly as to his financial condition, whether he owned real estate and if there were any judgments against him. Shelly stated to plaintiffs that he owned one-half interest in the Fairfax Inn Stand and also the building in which they then were, and as to judgments his "record was clear. that there was not the scratch of a pen against him." This is shown both by the testimony of Fouse and Bechtel; while it appears that there was judgments in Luzerne county, Pennsylvania, against him to the amount of several thousand dollars. Shelly does not deny there were judgments against him in Pennsylvania, and when asked to explain his statement in answer to plaintiffs' inquiry as to judgments against him said, "He asked me whether there was any judgments here against me and I told him that there was nothing here against me to prevent me from doing business with anybody." He does not deny that he told them his record was clear, that there was not a scratch of a pen against him. When Shelly informed the plaintiffs that $3,-100 was to be paid for the Hunter tract, they objected to the price as being too much when Shelly said he had already figured it at that price and when asked to see Hunter and see if he could not get it for less, he said he had already made the bargain and asked how he could go back to have the price reduced, when it clearly appears from the record that he only paid $500 for the land besides paying Hunter $310 as a commission, instead of one-fourth of the difference between $500 and the $3,100 for which he was

selling it to the plaintiffs as was his contract with Hunter. While it is a fact that he owned the tract, the title of which he had taken in Hunter's name, he was selling it to plaintiffs for $3,100 leaving the impression upon their minds that he was selling it to them as Hunter's land and that he was paying the price to Hunter. Shelly denies in his deposition that he had an option on the Hunter land, but there is no question about the fact that he led the plaintiffs to believe that the land did not belong to him but to Hunter and that he had contracted with Hunter for the land at $100 per acre, and it could not be had for less. He evidently thought if the plaintiff knew that he had paid but $500 for the land that they would refuse to pay the $3,100 which Shelly claimed had to be paid at once. By this deception he pocketed the difference between $810 and $3,100. At the time of making the contract, when Shelly claimed to own one-half interest in the Fairfax Inn property and also the Willard Corner property in which he had his office, he did not own the property but only had it under contract. The Willard property, which he claimed to own, G. W. Biser, from whom he purchased it, says he paid him on account of it $1,000 about the 10th of August, 1901, and still owed him $500, so that he had paid nothing on said property at the time of his making the statement that he owned it. Shelly insisted all the time that they must keep their transactions secret in order to enable them to obtain the necessary properties for their enterprise in the sand business, therefore they could not make the necessary investigations into his dealings and transactions. But for this they could have easily ascertained at the time that Shelly owned the Hunter tract and could have ascertained the price he paid for it as they did afterwards from Hunter. Shelly, in his monthly statements of money expended, for the month of July, 1901, credits himself with the item "By Hunter Deed, $3,100." In his letter to Fouse, dated July 16, 1901, acknowledging receipt of bank draft for the sum of $4,407 sent him by Fouse the day before, Shelly says, "I will take up the Hunter deed to-morrow, pay Wise $100 as per agreement with him. Pay Biser $1,000 on the property on the best terms he will make, and use the balance of the money to the best advantage; accounting for every item of

expense monthly as promised you." While the deed from Hunter and wife for the 31 acres to Shelly bears date April 1, 1901, it is acknowledged on the 17th day of July, 1901, the date Shelly said in his letter he would "take it up." The plaintiffs had made Shelly their agent to deal with the owner of this tract of land and to get it for less money if he could do so as they thought the price was too high, but he told them "That he had already dealt for it at that figure." And when asked to see Hunter and make an effort to get it at less money he answered, "That he had already dealt for the property and a deed had been prepared for it and that he could not go back and try to make a new deal with Hunter," clearly implying that he was then purchasing from the owner Hunter at $100 an acre. Surely it was not good faith on his part to sell to his partners his own land, which he had purchased at $500, at the sum of $3,100 concealing from them the fact it was his land and the price which he had paid for it, and leading them to believe that he was purchasing from another person at the advanced price at which he was selling for himself. It matters not that the land might have been worth the price which he was charging, he was intentionally deceiving his partners in the transaction that he might line his own pockets at their expense with the amount he was making at a profit on the land. It would have been a proper and legitimate transaction, if he had frankly told plaintiffs that he had purchased and owned that tract of land and proposed to put it into the concern at $100 per acre, claiming that to be the fair value of it, but the fact of his ownership he carefully concealed from them.

Plaintiffs under their contract furnished Shelly over $12,000 for investment in the properties and improvements who took conveyances to himself in his own name for the property purchased and utterly refused to secure plaintiffs in the amount thus furnished either by deed of trust or by in any way pledging the absolute title to the property, as was his duty under the provisions of the contract of partnership of July 2, 1901. The conveyance of said property, instead of being made to Shelly or some other person as trustee, are all absolute conveyances in fee to said Shelly. And though often requested to secure the money advanced by deed of

trust on the property or the conveyance of the title, he utterly refused to make any provision for their security, and plaintiffs refused to furnish any more money until such security was given. Plaintiffs could not reasonably be expected, after furnishing the large sum of $12,000 to an insolvent man who had invested the same in his own name by absolute conveyance, to furnish further funds in the face of his refusal to give them any security for what they had already furnished. Shelly contends that under the agreement of partnership he was not required to pledge the title until the plaintiffs should have advanced the whole amount of money required to carry out the purposes of the agreement. In this view of the case, plaintiffs would be required to furnish to their agent Shelly all the money necessary to establish the proposed business, $25,000 or $30,000, before they could be entitled to any security for the money as they advanced it. The language of the contract will bear no such construction as this. The contract provides that Shelly agrees to set over to the parties of the second part, their executors and assigns, three-fourths interest of all his right, title and interest in and to the herein described properties "and further agrees that the absolute title to the said properties shall be pledged to the said second parties until all the purchase money, together with the total sum of other expenditures, has been paid out of the profits of the business or otherwise." There is no provision in the agreement that the pledging of the title should be postponed untill all the money was furnished, but the reasonable construction is that it should be secured either by the conveyance of the title itself or other security on the property as the money should be furnished. No principle is better settled than that partners in all their transactions must observe the utmost good faith towards each other, and this applies as well to their negotiations in the formation of the partnership agreement as to any subsequent transaction involving their partnership interests. As said by Chief Justice Fuller, in *Oteri* v. *Scalzo*, 145 U. S. 578-588, "Undoubtedly equity has jurisdiction, when a person has been induced, by fraudulent representations, to enter into a partnership, to rescind the contract at his instance and put an end to it *ab initio*." Citing *Newbigging* v. *Adam*, 34 Ch. Div. 582; *Smith* v. *Everett*, 126

Mass. 304; *Fogg v. Johnston*, 27 Ala. 432; Story Part., sections 232, 285; Lindley's Part. (Wentworth's Ed.) 554. "False representations or fraudulent concealment in respect to the subject matter of the contract will entitle the injured party to rescission of the contract." And "The court will not inquire into the extent of the prejudice. It is sufficient if the party misled has been slightly prejudiced, if the amount is at all appreciable." 46 W. Va. 669. 2 Pom. &c. Jur., section 890. In *Howell* v. *Harvey*, 5 Ark. 270, 39 Am. Dec. 376, it is held: "Equity will declare a partnership void in case of fraud, imposition, or oppression in the original agreement, or where subsequent causes render the partnership onerous and oppressive." 1 Morawetz on Priv. Cor., section 412, and note. "A contract of partnership will be rescinded at the suit of one who was induced to enter into it by false representations, although thereby he suffered no pecuniary loss." 10 Cur. Law 1116, citing *Jones* v. *Weir*, 217 Pa. St. 321, 66 Atl. 550.

It will be further observed that defendant Nathan L. Chappelle, one of the parties of the second part in said agreement of partnership with the plaintiffs, was equally bound by the agreement with the plaintiffs to furnish the necessary capital and purchase money to pay for the properties and for the construction of the necessary improvements for the proposed enterprise, and it is not contended anywhere in the record that he ever furnished any part of the money that was furnished to Shelly for the purposes of the contract. The whole burden of furnishing the capital was thrown upon the plaintiffs who were misled not only by the fraudulent representations of Shelly but of Chappelle as well, who represented that in a short time he would be able to furnish his proportion of the necessary funds in which he wholly failed.

The second assignment of error is the decreeing that plaintiffs were entitled to a lien for the entire amount paid by them. The language of the agreement is clear upon this point, where it is provided that the absolute title to the property shall be pledged until all of the purchase money, together with the total sum of other expenditures, has been paid out of the profits of the business or otherwise, after the payment of which, dividends, if any there was, should be

declared to the several members or the partnership as their interests might appear. In 22 A. &. E. E. L, 131, it is said: ". On a dissolution, every partner is entitled as against the other partners and all persons claiming through them in respect of their interests as partners to have the property of the partnership applied in payment of the debts and liabilities of the firm, and to have the surplus assets, after such payment, applied in payment of what may be due to the partners respectively after deducting what may be due to the firm from them as partners. This right constitutes what is known as the partner's lien." And authorities there cited. And on page 133 (same volume,) "The partner's lien attaches to all the partnership assets at the time of dissolution or the ascertainment of a partners's share, whether realty or personalty, and to such assets only."

This assignment complains that the effect of decreeing a lien for the entire amount paid by plaintiffs was to impose all the debts, expenses and labor of the partnership upon the appellant, and to give the plaintiffs all that they had furnished without any obligation or liability incurred during the partnership. The monthly reports made by the appellant from the inception of the enterprise shows that no debts were created and no liabilities incurred, the proposed enterprise not having been put in operation. They further show that he retained his monthly salary for his services and had remaining in his hands a surplus.

The third assignment complains of the action of the court in refusing to allow the appellant the salary stipulated for in the contract after March, 1902. The contemplated enterprise was never put in operation and Shelly's salary could only be, under the agreement, $50 per month until the works commenced operation, after which it was to be increased to $100, and when the proceedings for the dissolution of the partnership and the rescission of the contract were commenced his salary would cease. The last report made by him shows sufficient money remaining in his hands to pay up his salary and more and he is not hurt by that ruling of the court.

The fourth assignment is that the court erred in winding up the affairs of the partnership and decreeing a sale of the property. This being a proper case for a dissolution of the

partnership, and the plaintiffs having shown sufficient cause therefor, the court could not stop at simply decreeing the dissolution, it was proper to proceed to wind up the affairs of the firm or partnership and subject the property thereof to the payment of its debts.

It is complained that the court erred in not having an account stated as prayed for by the defendants. The defendant Shelly made monthly reports up to the time of the institution of this suit with every item of account, the money furnished by the plaintiff and how expended. The plant never was put into operation and no partnership business was performed except some things preliminary to going into business. And the accounts rendered or reported by the defendant Shelly seem to be all the accounts that could be made up, upon which account the court took no action.

We see no error in the decree and therefore affirm the same.

*Affirmed.*