8771

RAWL *ET AL.* v. McCOWN *ET AL.*

(81 S. E. 959.)

ELECTIONS. REGISTRATION. BALLOTS. CANVASSING BOARDS. IRREGULARITIES. ILLEGAL VOTES NOT AFFECTING RESULT.

1. Any citizen taxpayer, liable as other taxpayers in like situation for debts incurred in establishment of a dispensary, may institute proceedings in nature of *certiorari*, to review action of State Board of Canvassers declaring election on question of such establishment legal, and the State is not a necessary party to such proceedings.

2. The mere participation of a taxpayer in an election does not estop him from questioning its validity.

3. Whether or not a petition for an election upon question of establishment of a dispensary was signed by one-third of the qualified electors was a question of fact to be determined by the county supervisor, and his determination is to be accepted as correct, unless the contrary is shown by evidence. Every reasonable presumption will be indulged to sustain an election.

4. Qualified electors who have honestly complied, or attempted to comply, with the law should not be denied the right of suffrage because of the fraud, caprice, ignorance or neglect of registration officers.

5. Registration of an elector by the proper officer, unless vacated, reversed or set aside in the manner prescribed by law, is conclusive as to the elector's qualification to vote at time of registration, and such right to vote cannot be collaterally attacked; though his vote may be challenged at the polls for any other cause which makes it illegal.

6. Unless the marks upon, or size of ballots are such as could destroy the secrecy of the ballot they do not violate the statutory provisions.

7. When the findings of the county board of canvassers are concurred in by the State Board of Canvassers, the Court will not review the decision of the State board as to whether the county canvassers had capacity to act.

8. Prejudice of a county canvasser is immaterial, where his findings are concurred in by the other members, constituting a majority of the county board, and are sustained by the State Board of Canvassers.

9. Failure of managers to send up return of votes in ballot box is a mere irregularity which does not vitiate the votes in those boxes.

10. Illegal votes where they can be eliminated from the count without affecting the result do not vitiate the election.

Proceeding on petition for writ of *certiorari* by D. B. Rawl and others, citizen taxpayers in the original jurisdiction of the Supreme Court to review the acts of the State Board of Canvassers on hearing and deciding an appeal from the county board of canvassers for Lexington county.

*Mr. D. W. Robinson,* for the petitioners, cites: *Right to maintain action regardless of consent of Attorney General:* Const. V. 4; Code of Civ. Proc., sec. 11; 117 N. W. 257; 19 L. R. A. (N. S.) 613, 614; 32 Am. Rep. 219; 30 S. C. 581, 582; 39 S. C. 311; 48 S. C. 10, 13; 75 S. C. 423. *Illegality of election at various precincts:* 86 S. C. 456. *Authority for election:* 27 Stats. 745, 746. *Who are qualified electors:* 78 S. E. 738; 76 S. C. 584, 589; 84 S. C. 51; 86 S. C. 455, 456. *Registration invalid:* 1 Code of Laws 1912, 200, 236; Const. II. 4 (d); 84 S. C. 51; 86 S. C. 455. *Form of tickets:* 1 Code of Laws 1912, 231,

232; 76 S. C. 581, 582; 84 S. C. 49, 50; 78 S. C. 469, 470; 52 S. C. 303, 304. *No returns in box:* 1 Code of Laws 1912, 241. *Registration certificates and tax receipts not required of voters:* Const. II. 4 (e); 1 Code of Laws 1912, 231; 76 S. C. 584, 587, 591, 592; 84 S. C. 51; 86 S. C. 455, 456. *Capacity of canvassing board:* 86 S. C. 455. *Estoppel:* 78 S. C. 471.

*Mr. C. M. Efird* and *Messrs. Thurmond, Timmerman & Callison,* for the respondents.

The opinion was filed April 27, 1914.

The facts are stated in the opinion of the Court, which was delivered by MR. JUSTICE HYDRICK.

Under a writ of *certiorari,* directed to the State Board of Canvassers, we are called upon to review the action of that board in affirming the decision of the county board of canvassers for Lexington county, which overruled the contest of the petitioners of the election held, in August, 1913, on the liquor question.

Respondents demurred to the petition on the ground that the question is one of a public and political nature, involving no such private right as would entitle petitioners to maintain the action, except in the name of the State, by consent of the Attorney General, which consent was refused.

The weight of authority and reason is against the position taken by respondents. In *Lord* v. *Bates,* 48 S. C. 95, 26 S. E. 213, the petitioner applied to this Court for the writ of mandamus against the State Treasurer. The Attorney General refused to allow the State to be made a party, and, on his motion, the name of the State was stricken from the record. But the Court held that the petitioner was entitled to maintain the action in his own name. Mr. Justice Gary, speaking for the Court, said: "Mr. Chief Justice Taney, in delivering the

opinion of the Court in the case of *Commonwealth of Kentucky* v. *Denison, Governor, etc.,* 24 Howard's U. S. Rep. 66, at page 97, says: 'It is equally well settled that a mandamus in modern practice is nothing more than an action at law between the parties, and is not now regarded as a prerogative writ. But the right to the writ, and the power to issue it, has ceased to depend upon any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable. It was so held by this Court in the cases of *Kendall* v. *United States,* 12 Pet. 615; *Kendall* v. *Stokes et al.,* 3 How. 100. And further, that the writ of mandamus does not issue from or by any prerogative power, and is nothing more than the ordinary process of the court of justice, to which every one is entitled, where it is the appropriate process for asserting the right he claims.' Mr. Chief Justice Simpson, speaking for the Court in *State* v. *Whitesides,* 30 S. C. 561, 9 S. E. 661, says: 'This writ was once a prerogative writ, and, in England, was supposed to issue at the instance of the crown, to meet and remedy otherwise remediless cases at his discretion. But in this country it has lost its prerogative character, and though issued in the name of the State, yet it belongs to the Courts, and has become a form of action governed by established rules as applied under established form.' See, also, A. & E. Enc. Law, vol. 14, page 92, and authorities referred to in the notes. This question was presented to the Court in *State ex rel. Hoover* v. *Chester,* 39 S. C. 307, 17 S. E. 752; and, while it was in terms reserved, still, if the Court had thought the objection interposed by the Attorney General was valid, it would have been without jurisdiction in the premises, and, of course, could not have decided the case then before it. The Albany Law Journal of November 7th, 1896, contains a very interesting article, giving a historical sketch of this writ. Many other authorities could be cited in support of our views, but we deem it unnecessary."

Respondents contend that, in analogy to the rule in actions for damages resulting from public nuisances, to entitle them to maintain this action in their own names, the petitioners must show some peculiar or special interest in the decision of the question, or damages which they will suffer from the contemplated action, which differs in kind and not merely in degree from that which the public generally will sustain. This point was •decided otherwise in *Mauldin* v. *Greenville,* 33 S. C. 1; 11 S. E. 434. In that case, the Court held that the plaintiffs, as citizens and taxpayers, were entitled to sue, in their own names, to enjoin the city council from unauthorized acts whereby the burden of taxation would be increased, though no such special damage was alleged. The cases relied upon by respondents in this case were cited by the Court and distinguished in that case. In *Croxton* v. *Truesdale,* 75 S. C. 418, 56 S. E. 45, this Court held that private citizens had the right to sue to enjoin the illegal establishment of a liquor dispensary in their town.

Where the private or property rights of the citizens are invaded or threatened by the illegal action of a public body or board, he is entitled to relief, and the Courts will not deny him a remedy. The weight of authority in this country is that those writs which, in England, were originally prerogative writs, and issued only at the instance of the crown, have lost their prerogative character, and now belong to the Courts to be used as other process in the enforcement of private rights and the prevention of private wrongs. In such cases, the State is not a necessary party, though they may also be of such a public nature that the Attorney General might bring the action in the name of the State, or allow it to be brought in the name of the State upon the relation of the citizen.

The argument that, if the dispensary is established, petitioners will not be damaged, because, under the Constitution and statute and the decisions of this Court, the debts

2—97

thereby incurred will be debts of the State and not of the county, overlooks the fact that the county is a part of the State, that petitioners are taxpayers of the State, as well as of the county, and that the State makes the county liable to it for such debts.

The objection that the petitioners are estopped by reason of having participated in the election must be overruled. *Birchmore* v. *Board,* 78 S. C. 461, 59 S. E. 145.

Before entering upon the consideration of the grounds of contest, it may not be out of place to say, as a note of warning to those entrusted with the administration of the election laws, that the evidence in this case, and others which have come before this Court, shows such laxness in the administration of those laws and such flagrant violations of them as ought to startle any thoughtful citizen. It is fraught with the gravest dangers to good government, and may result disastrously, when much graver issues are at stake. At least since 1898 the boards of registration have practically ignored the provisions of the Constitution and statutes on the subject. Only in rare and exceptional cases have they applied and enforced the tests prescribed to determine the qualification of those who have applied for registration, or administered the oath prescribed. Notwithstanding this Court declared, seven years ago, in *Wright* v. *Board,* 76 S. C., 574, 57 S. E. 536, that the production of a registration certificate and proof of the payment of all taxes due and payable for the previous year was a condition precedent to the right to vote, and that every vote cast without doing so was illegal; at some of the voting places persons were allowed to vote without complying with those mandatory provisions of the law. In *Davis* v. *Board,* 86 S. C. 461, 68 S. E. 876, this Court said, with regard to provisions of law which are merely directory: "These provisions of the statute should, how-

ever, be observed by the election officers, whose sworn duty is to administer the law as enacted by the legislature. It has been well said that, before an election, all provisions of the statute should be deemed and held by the officers of the election to be mandatory. Any wilful neglect of duty by such officers is made a misdemeanor by statute. Sec. 284, Crim. Code."

The statute under which this election was held required, as a condition prerequisite, that a petition therefor, signed by one-third of the qualified electors of the county, should be filed with the supervisor. The first ground of contest is that the petition was not signed by the required number of qualified electors. The respondents take the position that this objection comes too late, and cannot now be made a ground of contest of the election. The point was decided otherwise in *Little* v. *Barksdale*, 81 S. C. 392, 63 S. E. 208. See, also, *Parler* v. *Fogle*, 78 S. C. 570; 59 S. E. 707.

There were 72 petitions, which contained a total of 2,073 signatures, filed with the supervisor. Many of those who signed the petitions were not qualified electors. The registration books of the county have about 6,800 names on them, but there are not more than from 4,200 to 4,500 qualified electors in the county. This discrepancy arises from the fact that there are on the books the names of electors who have died since registering, some who have moved out of the county, and from one precinct to another and from one polling place to another in the same precinct, so that, in some instances, the same name appears on the books two, three and even as many as four times. Again, in same cases, different persons have the same name and initials.

To determine whether the petition was signed by the required number of electors, the supervisor obtained from the board of registration a certificate that there were not

more than 4,200 qualified electors in the county, and, with the aid of two competent assistants, he spent about two weeks comparing the names on 24 of the petitions, which contained a total of 519 signatures, with the registration books, and found, according to the best information that he could obtain, that 389 of them were qualified electors. Adopting this as a fair average, he decided that 74 per cent. of those who signed the petition were qualified electors. He found, therefore, that the petition was signed by the required number, and ordered the election.

There was no legal error in the method adopted by the supervisor. From the very nature of the case, mathematical precision was impracticable, if not impossible. The degree of precision which may be required in such a case necessarily depends to some extent upon the number of names to be canvassed and the extent of the territory in which they reside. Where both are large, as in this case, there can be no legal or reasonable objection to the method adopted, especially where the estimates are fairly and honestly made, and it is not even suggested that they were not so made in this case. Moreover, the decision of the supervisor was *prima facie* correct, and before this ground could have availed the contestants, they would have had to show that the petition was not, in fact, signed by the required number, which they failed to do.

The contention that the supervisor erred in not examining the tax books to ascertain whether those who signed the petition had paid their taxes cannot be sustained. For, while it is true that a qualified elector must be one who is qualified to vote (*Culp* v. *Union,* 95 S. C. 131, 78 S. E. 738), and the payment of all taxes assessed and collectible during the previous year is a prerequisite of the right to vote, still the presumption is that those who signed the petition had paid their taxes, and the burden was upon contestants

to prove that they had not.    Every reasonable presumption will be indulged in to sustain an election.

The next ground of contest is that the entire registration of the electors was invalid, because the registration officers failed to apply the tests of qualification prescribed by the Constitution and statutes for those applying for registration, or to administer the prescribed oath to them.    These provisions of the law are directed to the officers who are entrusted with its administration, and not to those who apply for registration, unless they are guilty of a fraudulent participation in violating them.    It would be unreasonable and unjust to deny to honest electors, who complied with the law, and those who were ready and willing to comply with it, their constitutional right of suffrage on account of the fraud, caprice, ignorance or neglect of duty of the registration officers.

Moreover, by the Constitution and statutes of this State, registration is made conclusive evidence of an elector's qualification therefor at the time it was granted, unless it is annulled in the manner prescribed by law.    The Constitution (subdivision (c) of section 4, article 2) provides that all persons registered before January 1, 1898, shall remain qualified electors during life, unless disqualified by the other provisions of that article. Section 5 of the same article provides that any person denied registration may appeal to the Courts to determine his right to vote, and that the legislature shall provide for the correction of illegal and fraudulent registration.    Section 8 of the same article provides that the registration books shall be public records, open to the inspection of any citizen at all times; and section 11 provides that they shall be closed at least thirty days before an election, during which time transfers and registration shall not be legal. The act of 1898 (sec. 206, vol. I, Code 1912) provided that, up to and including January 1, 1898, the boards of registration should judge of the qulaifications of all appli-

cants for registration; that any person denied registration might appeal to the Court of Common Pleas, and that the applicant or any qualified elector of the county might appeal from the decision of the Court of Common Pleas to the Supreme Court. Section 208 provides that, after January 1, 1898, the board of registration shall judge of the legal qualifications of all applicants for registration, with like right of appeals as provided in section 206. Section 213 reads: "The board of registration shall revise the list of registered electors at least ten days preceding each election, and shall erase therefrom the names of all registered electors who may have become disqualified, or who, upon satisfactory evidence, may appear to have died, or removed from their respective counties, or who have been illegally or fraudulently registered: *Provided,* That any one who may deem himself injured by such an act may have the same right of appeal to the Court of Common Pleas or any Judge thereof, as hereinbefore provided for persons who have been denied registration." These provisions of the law make manifest the intention that registration by the proper officers is conclusive evidence of the qualifications of the elector therefor, until reversed or set aside in the manner prescribed, for which ample time and opportunity is allowed. This does not mean that registration alone, or the possession of a registration certificate, entitles the holder thereof to vote. A registered elector may be denied the right to vote on numerous grounds; as, for example, if he was registered within thirty days of the election (*Gunter* v. *Gayden,* 84 S. C. 48, 65 S. E. 948), or if, since his registration, he has removed his residence from the county, or his precinct, or has been convicted of a disqualifying offense, and for other causes. It means only that registration concludes collateral inquiry into the qualification of the elector therefor at the time it was granted. His vote may, however, be challenged at

the polls, or on contest of the election, for any other cause which makes it an illegal vote.

The next ground is that the ballots voted did not comply with the requirements of the statute. The statute under which the election was held provides that the election shall be held and conducted by the same officers and under the same rules and regulations provided by law for general elections. It also provides that every voter who may be in favor of the sale of liquors shall cast a ballot on which shall be printed the words: "For sale of alcoholic liquors and beverages," and every voter opposed thereto shall cast a ballot on which shall be printed the words: "Against sale of alcoholic liquors and beverages." The general election law (sec. 236, vol. I, Code 1912) provides that ballots shall be of plain white paper, two and a half inches wide by five inches long, clear and even cut, without ornament, designation, mutilation, symbol or mark of any kind whatsoever, and that no ballot of any other description shall be counted. The ballots provided by the commissioners of election had printed at the head thereof the words, "Lexington County. Special election upon the question of 'Dispensary' or 'No Dispensary' under the act of the General Assembly at its 1912 session. August 19, 1913." Some of them had printed in the body thereof the words: "For sale of alcoholic liquors and beverages." On others were the words: "Against sale of alcoholic liquors and beverages." Some ballots were voted which had no heading, and only the words, "Against sale of alcoholic liquors and beverages" printed thereon. These were furnished by those opposing the sale of liquors, and it is contended by the petitioners that they were the only legal ballots cast. Their objection to the others is that the heading makes them obnoxious to the provisions of the statutes above quoted. This objection cannot be sustained; for, while the statute of 1912 does say that the ballots shall contain the words mentioned,

there is no prohibition, express or implied, against the printing thereon of the words above quoted. There can be no objection, founded on good reason, to the heading. The main purpose of the statute in prescribing the size of the ballot, the kind of paper on which it shall be printed, and in prohibiting any ornament, designation, etc., was, no doubt, to preserve the secrecy of the ballot, and to prevent fraud, intimidation and bribery. While the statute is mandatory, it should be construed reasonably, regard being had to its purpose, and the mischief which it was intended to prevent. The heading, being the same on the ballots for and against sale, could not have destroyed the secrecy of the ballot. Therefore, it did not conflict with any provision of the statute. The other ballots, on which there was no heading, were contested by those in favor of sale only on the ground that they were not of the prescribed size. They varied from the size prescribed less than an eighth of an inch, a difference so slight that it could not be detected, except by precise measurement with a finely graduated rule, or by the most careful and minute inspection. As the difference was so slight that it was not appreciable to the eye, it could not have destroyed the secrecy of the ballot. The lawmakers did not intend that legal voters should be deprived of their right of suffrage by such a strict and technical construction of the statute which was designed merely to safeguard that right.

This conclusion is not in conflict with the decision in *Ex parte Riggs,* 52 S. C. 298, 29 S. E. 645. The report of that case shows that certain ballots were not counted, because they did not come up to the requirements of the statute "in respect to size, and were not without ornament, designation," etc., but it does not show what the difference in size was, or what the ornament, designation, etc., was. But the Court found that an inspection of the ballots "very plainly showed the fact," that is, that they did not meet the requirements of the statute. If ordinary inspection

very plainly showed that fact, of course, the purpose of the statute was frustrated, for the secrecy of the ballot was thereby destroyed, since the ballots rejected were not the only ones voted, and they differed from the others in the respects mentioned.

During the hearing before the county board of canvassers, two members of the board were noticeably under the influence of liquor. The other member, Mr. G. A. Goodwin, who was sworn as 'a witness for the petitioners, and he was the only witness on that point, testified that they were not so drunk as to incapacitate them, and he signed with them a report to the State board to that effect. As there was evidence to support this finding, which was concurred in by the State board the question is not reviewable here.

The further ground is taken that one of the members of the board, besides being under the influence of liquor, was so biased and prejudiced against the contestants, that he actually declared the contest overruled before hearing any evidence or argument. Deplorable as this may be, it cannot avail the contestants, because the other members of the board constituted the majority, and there is no evidence that they, or either of them, was biased or prejudiced. Moreover, the State board, upon the same evidence, which is practically undisputed upon the chief grounds of the contest, sustained the decision of the county board.

The vote of Pool's Mill and Efird's Store was contested on the ground that the managers did not send up a return of the votes in the ballot boxes. The returns were sent to the secretary of the board of canvassers and were produced by him and put in evidence. This was a mere irregularity which does not vitiate the vote of those boxes. *Wright* v. *Board,* 76 S. C. 586, 57 S. E. 536.

At Shull's Store and Edmund's, the managers did not require proof of payment of taxes. Some of the voters at each precinct did produce their tax receipts, but enough illegal votes were cast at each to leave the result in doubt, and, therefore, the vote of these precincts should have been rejected. At Crout's Store, the managers did not require the voters to produce either registration certificates or tax receipts. The vote of that box should have been thrown out. At a few other precincts, illegal votes were cast, but they were clearly identified, so that the ballot can be purged of them.

The other grounds of contest were not pressed in the argument, and, therefore, they will not be discussed in detail. It is only necessary to say that they have no substantial merit, and are, therefore, overruled.

After deducting the vote of the precincts which should have been thrown out, and all other illegal votes, there still remains a majority in favor of sale.

For the foregoing reasons, the petition is dismissed, and the result of the election, as declared by the State Board of Canvassers, is affirmed.

MR. JUSTICE FRASER, *dissenting*. I cannot concur in this opinion. It seems to me that when the officers of the law charged with the execution of the law do what the law forbids or fail to do what the law commands, the result of the unlawful acts is a nullity at least.

MR. JUSTICE GAGE did not sit in this case.

---

FOOTNOTE—The question of marked ballots is treated in a note in 47 L. R. A. 806.