OSCAR DANIELS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 33582. Promulgated May 15, 1931.

*I. Howard Lehman, Esq., Henry Brach, Esq.,* and *Mortimer Brenner, Esq.,* for the petitioner.

*Arthur H. Fast, Esq.,* for the respondent.

272

OPINION.

VAN FOSSAN: For the year 1920 the respondent determined an overassessment. Despite the elaborate argument made by petitioner, we believe the Board to be without jurisdiction as to this year. *Cornelius Cotton Mills*, 4 B. T. A. 255; *Fort Pitt Spring & Manufacturing Co.*, 5 B. T. A. 1106; *Jackson Iron & Steel Co.*, 19 B. T. A. 1208.

The remaining issue to be decided at this time is whether or not the supplemental agreement, dated August 15, 1919, constituted a new contract superseding the contract dated October 30, 1917, and thus rendering the income derived therefrom not subject to sections 301 (c) and 301 (b) of the Revenue Acts of 1918 and 1921, respectively.

Section 301 (c) of the Revenue Act of 1918 provides as follows:

For the taxable year 1919 and each taxable year thereafter there shall be levied, collected, and paid upon the net income of every corporation which derives in such year a net income of more than $10,000 from any Government contract or contracts made between April 6, 1917, and November 11, 1918, both dates inclusive, a tax equal to the sum of the following:

(1) Such a portion of a tax computed at the rates specified in subdivision (a) as the part of the net income attributable to such Government Contract or contracts bears to the entire net income. In computing such tax the excess-profits credit and the war-profits credit applicable to the taxable year shall be used; * * *

Section 301 (b) of the Revenue Act of 1921 contains a similar provision applicable to the calendar year 1921.

The original contract of October 30, 1917, was negotiated and entered into during the period of active hostilities and was predicated on the exigencies and circumstances peculiar to that period. The situation on August 15, 1919, the date of the supplemental contract, was entirely changed and the material differences between the original and the supplemental agreements clearly reflect such change. In specific language the supplemental contract " cancelled " certain provisions of the original contract. Time was of the essence in the original contract, but was not in the supplemental agreement, in which the provisions relating to the penalty for delay and premium or bonus for advanced delivery were eliminated. The paragraph pertaining to the wages of employees and the conditions of employment were decidedly different in the two contracts. The original contract provided for adjustments for alterations, omissions, additions and substitutions; the supplemental eliminated all such equalizations except as to the substitution of Foster boilers for Baden-hausen boilers and also included all excess wage costs except as governed by the express instruction of the Fleet Corporation. In the supplemental agreement the provision relating to the payment of any amounts in excess of the value of labor and materials already expended was made subject to waiver by the Fleet Corporation. The paragraph prohibiting the petitioner from making any commitments for main engines, turbines, etc., without the written approval of the Fleet Corporation was changed to apply to condensers, winches, etc. In the supplemental agreement a possible deficiency in the tonnage of the completed ships was to be compensated for at the rate of

$193 per dead-weight ton instead of $162 per dead-weight ton as in the original contract. In case of any conflict in the terms and provisions of the two contracts the supplemental contract was to prevail. The supplemental agreement was entered into in response to the letter of Edward N. Hurley, president of the Fleet Corporation in which the following appears:

Six months have now elapsed since the signing of the Armistice, and industrial conditions are returning to normal. Therefore we feel that the contracts you were awarded during the war should be revised in adaptation to the conditions under which the work will be done.

The petitioner recognized the changed conditions mentioned by Mr. Hurley and its offer to enter into a new contract was based thereon.

The case of *Goss Printing Press Co.*, 11 B. T. A. 365, contains facts in all respects comparable to those in the case at bar. In that case we said:

This so-called supplemental contract was, we think, a new agreement, which cancelled and took the place of the original contract, and which by its express terms defined and fixed the rights and obligations of both parties. "An agreement when changed by the mutual consent of the parties, becomes a new agreement, which takes the place of the old, and consists of the new terms and as much of the old agreement as the parties have agreed shall remain unchanged." 13 C. J. 595. "A contract once made can not be modified except by a new meeting of minds, and when such mind-meeting occurs a new contract springs into existence." *United Transp. & Lighterage Co.* v. *N. Y. & Baltimore Transp. Line*, 185 Fed. 386. *Mason* v. *United States*, 17 Wall. 67.

In the *Goss* opinion we also set forth at length the purpose and history of the legislation embodied in section 301. It is unnecessary to repeat that comment here. Judged by the test established in the *Goss* case, we are of the opinion that the contract of August 15, 1919, constituted a new agreement between the parties to the original contract of October 30, 1917. The price of the articles manufactured is a vital element in comparing the two contracts. Payments of the purchase price were made under the supplemental contract with appropriate credits for any payments or advances that may have been made under the original agreement. The payments from which the income arose were made upon the delivery of the ships. None had been completed and delivered by August 15, 1919, and, therefore, none of the income was attributable to the original contract. On that date the petitioner was entitled to no part of the purchase price of $1,539,000 for each completed vessel and would have been entitled to compensation for services and materials furnished only in case of a cancellation or other breach of contract on the part of the Fleet Corporation. However, under the supplemental agreement it was required to render further services and to furnish additional material in order to manufacture and deliver the articles enumerated therein.

If such services and material had not been supplied the petitioner would have derived no income from any source. It merely would have failed to complete its contract made on August 15, 1919.

In the cases cited by the respondent the contractors had been ordered to stop work. Subsequently " cancellation contracts " were entered into fixing the amount of damages sustained by the contractors by reason of the Government's breach of contract. We must bear in mind that in both the case under consideration and the *Goss* case the Government chose to receive the manufactured products rather than to cancel the contracts. Such a course was to the mutual advantage of both the Government and the petitioner. The Government saved the payment of damages by reason of its cancellation and the petitioner avoided the inconvenience and possible serious loss due to the sudden cessation of industrial operation by a going concern. In order to effect a new agreement it became necessary to establish new terms and new provisions consonant with the changed economic and business situation which developed during the postwar period. Hence, the continuation of operations under either a new or supplemental contract, whichever term we may use, was, by virtue of that agreement, carried on under market and manufacturing conditions quite different from those existing during the period from April 6, 1917, to November 11, 1918, inclusive. Therefore, the income of the petitioner during the years 1920 and 1921 was attributable to its operations under the supplemental agreement and was not derived from a Government contract made between April 6, 1917, and November 11, 1918, inclusive. Such income is not taxable under the provisions of sections 301 (c) and 301 (b) of the Revenue Acts of 1918 and 1921, respectively.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

STERNHAGEN, dissenting: The petitioner is taxable at war rates upon such proportion of its income as was attributable to its original Government contract. Some of its income was apparently attributable to the new contract, but not all of it. Plainly more that $10,000 was from work under the original contract, and section 301 requires that under such circumstances, an apportionment must be made and the war rates applied to the portion of the income which is attributable to the war contract. While I agree that there was a new contract, it does not follow that all of the income is attributable alone to the new contract. A substantial part of it was earned before the new contract was made. In the *Goss* case there was, so far as the report shows, no income from the original con-

tract, which was made a few days before the Armistice; no manufacturing was done under the original contract and nothing was earned. The corporation had merely provided itself with some machinery in anticipation of securing a war contract, but before performance began the new peace-time contract was made.

MORRIS and ARUNDELL agree with this dissent.